139 N.J. Super. 83 (1975)
352 A.2d 599
STANLEY C. VAN NESS, PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY, PLAINTIFF, WILLIAM F. HYLAND, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, PLAINTIFF-INTERVENOR,
v.
BOROUGH OF DEAL; DEAL CASINO; PHILLIPS AVENUE PAVILION; DANIEL KRUMAN, MAYOR OF THE BOROUGH OF DEAL; STANLEY R. KATZ, A COMMISSIONER OF THE BOROUGH OF DEAL; DR. HAROLD V. GARRITY, JR., A COMMISSIONER OF THE BOROUGH OF DEAL; AND W. STANLEY CONOVER, ADMINISTRATOR-BOROUGH CLERK OF THE BOROUGH OF DEAL, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided December 9, 1975.
*86 Mr. Robert P. Corman, Assistant Deputy Public Advocate, and Mr. Arthur Penn, Assistant Deputy Public Advocate, for plaintiff (Mr. Stanley C. Van Ness, Public Advocate of the State of New Jersey, attorney).
Mr. Stephen E. Brower, Deputy Attorney General, for plaintiff-intervenor (Mr. William F. Hyland, Attorney General of the State of New Jersey, attorney).
Mr. Thomas L. Morrissey and Mr. Michael S. Waters for defendants (Messrs. Carpenter, Bennett & Morrissey, attorneys).
*87 LANE, J.S.C.
This is an action for declaratory judgment that defendants illegally discriminate against nonresidents and for an injunction to enjoin such discrimination. The issues set forth in the pretrial order are:
(a) Is the statute establishing the Public Advocate unconstitutional?
(b) Does the Public Advocate have standing in view of the appearance of the Attorney General?
(c) What portion of the beach and adjacent areas is subject to the public trust doctrine?
(d) Is the Deal Casino, which was financed by local taxation, subject to the public trust doctrine?
(e) Is the Phillips Avenue Pavilion subject to the public trust doctrine? If yes, is the difference in fees charged residents and nonresidents illegal discrimination?
(f) Does defendant exclude the public from the use and enjoyment of the public trust area?
(g) Were state monies used for private purposes and in violation of N.J. Const. (1947), Art. VIII, § III, par. 3? If so, what effect does that have on the use of the Pavilion and the Casino?
Deal is a municipal corporation in Monmouth County which borders on the Atlantic Ocean for its entire one-mile eastern boundary. It is bordered on the north by the City of Long Branch, on the south by the Borough of Allenhurst, and on the west by the Township of Ocean. Typical of most shore communities bordering on the Atlantic Ocean, its winter population enlarges considerably in the summer months when persons arrive to occupy summer homes they either own or rent in the borough.
Of the mile-long coastline only 1300 feet is owned by the municipality and utilized as a bathing beach. This stretch is divided into the Deal Casino beach, the Phillips Avenue Pavilion beach, and a surfing and boating beach. The dry sand in this area reaches back approximately 300 feet from the mean high water mark. The other beachfront property in the borough is not open to the public for swimming or *88 recreation since much of the remaining beachfront is made up of shallow beaches often ending in rocky seawalls which are reached by high tide. Also, lifeguards are only provided at the Pavilion and Casino beaches.
The location of the Deal Casino Beach Club is on the east side of Ocean Avenue and abuts the high water mark of the Atlantic Ocean. On the north and south boundaries of the property is an eight-foot chainlink fence. On the west side is a brick wall. A rope barrier has been strung along the sandy eastern portion of the Casino about 50 feet west of the mean high water line. The Casino beach is north of the boating and surfing beach and south of the Pavilion beach.
The property was apparently acquired by foreclosure proceedings and by outright purchase. The initial construction of the Casino was financed by a bond issue. Subsequent improvements were financed by municipal revenues, bond anticipation notes, capital improvement funds and Fiscal Assistance Act funds. Ordinance 347, passed March 22, 1954, for the construction of the Casino provided in § 5(d), "The improvement as authorized by this ordinance is necessary to provide adequate and suitable bathing and recreational facilities."
The Casino itself is a substantial facility containing a large swimming pool, a large parking lot, cabanas, bathhouses, snack bar restaurant and certain sports facilities, together with the sandy beach stretching to the ocean.
In 1956 the site on which the Casino beach stands was occupied by a bluff from 20 to 30 feet above the sea with high tides reaching to the base of the bluff and affording no usable bathing beach. The beach immediately in front of the Casino was constructed by the borough entirely at the borough's expense. The project was a substantial operation which required the bulldozing of the bluff and the creation of a beach on property upland of the mean high water mark.
In 1957 wells and an intake pipe for the pool were constructed. In 1958 the seawall along the ocean was reinforced *89 to protect the oceanfront sand, and a jetty designated as the Brighton Avenue jetty was constructed adjacent to the beach. It is not suggested that the jetty was paid for by Deal. A pool pump was purchased in 1962. Leveling slabs were installed in 1963. A manhole and a pumping apparatus were set in place in 1965. Bathroom facilities and a reconstructed pump-house were completed in 1966. The wells were reconstructed in 1963, and in 1970 repairs to the pool and concrete were made. In 1972 beach cleaning equipment was purchased and additional bathhouses built. In 1973 a restaurant and recirculating system were added.
The Casino was designed to be a municipal enterprise operated by the borough commissioners. The Revised Ordinances of the borough, Chapter VI, were adopted April 23, 1973 and revised July 9, 1974. They provide rules and regulations for the operation of the Casino. These rules and regulations specifically prohibit any person other than a member, guest of a member or employee to enter into or upon the Deal Casino Beach Club. All decisions as to the amount of dues to be paid for membership, as well as the terms upon which a person may become a member, are left to the board of commissioners to establish by resolution. The board is further empowered to lease bathhouses and cabanas to individuals who become members of the club and their guests at such rates and upon such terms as the board establishes by resolution. Certain other rules, such as the requirement that members exhibit a membership card upon their entry to the Casino, that no dog be allowed on Casino property and that bathing be permitted only at designated times and places, are included in the Casino ordinances. The promulgation of any and all other rules and regulations for the use, management and control of the Casino is left to the board of commissioners.
The borough ordinances provide that persons are liable to fines and punishments if they swim at beaches in the borough which are not designated as protected beaches. The *90 Phillips Avenue Pavilion and the Casino are the only areas that are so designated.
The rules include, among others, the following guidelines and practices:
Only the immediate family of year-round residents of the borough, their nonresident parents and nonresident members of their immediate families, and nonresident owners of real estate in the borough are eligible to apply for membership in the Casino. Applications must be filed between April 1 and the end of the first week in May and must be completely answered. To obtain an application through the borough's seasonal mailing of application forms, an individual must have been a member of the Casino the previous season. Rental of no more than one bathhouse or one cabana is permitted to any immediate family which is eligible for membership. No other citizens of this State can become members of the Deal Casino. Daily entrance is only available to guests of members for $3 for a weekday and $7 for a weekend or holiday.
In 1974 approximately 2,450 members used the Casino facilities. The following reflects the number of people in the various facilities: 356 in cabanas, 131 in beach houses, 1,327 in deluxe bathhouses, 640 in small bathhouses. The membership fees received by the borough for the Casino in 1974 were $259,750. Approximately 6,147 guests were admitted in 1974, for which fees totaling $26,870 were received. The budget for the Casino in 1974 was $202,400 for direct costs.
In addition to the facilities mentioned, there are also available at the Casino eight restrooms divided between men and women, a restaurant with a seating capacity for 100 persons, a swimming pool, basketball, shuffleboard and tetherball facilities.
The Casino beach length from north to south at the wet sand area is approximately 350 feet. It should be noted that the lands east of the rope barrier mentioned above are accessible to the nonresident public entering through the Pavilion *91 or through the many east-west streets that terminate at the beach. The public is permitted to swim in the ocean east of the Casino beach.
Plaintiffs contend that (1) the shoreline between mean low and mean high tide seaward of the Deal Casino is owned by the people of New Jersey and held in trust for them by the State under the public trust doctrine, and (2) the public at large is entitled to access to and use of the dry sand and also to the facilities at the Deal Casino.
The borough also owns the beach and facilities called the Phillips Avenue Pavilion. The Pavilion is a bathhouse facility immediately north of the Casino. It is a less elaborate facility and was in existence at the time the present Casino was erected. The beach is approximately 475 feet long by 300 feet wide. The Pavilion contains bathhouses, lockers, toilets, changing rooms, free parking and certain sports activities, all of which are available to the general public, both residents and nonresidents of the borough. A nonresident of the borough wishing to use the Pavilion beach may do so either on a daily basis by the payment of a fee equal to that charged residents or on a seasonal basis by the payment of a fee which is also equal to that charged residents. For that fee a nonresident patron of the Pavilion obtains the use of all of its facilities. Should a nonresident desire to obtain seasonal use of the locker facilities in the Pavilion, he may do so but at a fee which is higher for nonresidents than for residents. When a nonresident pays the beach use fee he obtains all necessary changing and toilet facilities and he may use the free parking and sports facilities that are available to all of the guests of the Pavilion.
The beach that is available to persons entering the Pavilion, and which is maintained exclusively for their use, other than the trust portion of the property, constitutes approximately one-third of all of the bathing beach under the control of the borough. Members of the Casino are excluded from the Pavilion beach, just as patrons at the Pavilion are *92 excluded from the Casino dry sand beach, except for the 50 feet referred to earlier.
The third beach, the surfing and boating beach, is utilized by all bathers, both those of the Pavilion and those at the Casino. The Casino beach is between the Pavilion beach and the boating and surfing beach. Patrons of the Pavilion can cross to the surfing and boating beach by using the trust lands, that is, land between the mean high water mark and the mean low water mark; and they may also use the additional beach that is west of the mean high water mark up to the rope that is maintained.
Plaintiffs contend that the Pavilion fee structure is discriminatory and repugnant to the Supreme Court decision in Neptune City v. Avon, 61 N.J. 296 (1972).
Defendant contends that the statute establishing the Department of Public Advocate is unconstitutional. Further, it is defendant's position that in view of the appearance of the Attorney General, the Public Advocate has no standing and should be dismissed from the suit at a minimum. Defendant contends that unless the relief it requests is granted, then state funds will have been used for private purposes, in violation of N.J. Const. (1947), Art. VIII, § III, par. 3.
This case is very difficult. The Deal Commission has not tried to exclude nonresidents from the trust land beach. It has endeavored to provide a facility for its residents so that they can enjoy themselves in comparative comfort, for which the residents are willing to pay. It must be noted that Deal is a very sophisticated, wealthy and quiet resort. There are no areas of honky-tonk. The community is strictly and well governed. Its position in the operation of its beaches is understandable.
Defendants contend that the delegation of power to the Public Advocate was unconstitutionally broad since no standards have been specifically set forth to guide the Public Advocate's exercise of power.
*93 N.J.S.A. 52:27E-29 provides:
The Division of Public Interest Advocacy may represent the public interest in such administrative and court proceedings, other than those under the jurisdiction of the Division of Rate Counsel pursuant to Article II herein, as the Public Advocate deems shall best serve the public interest.
"Public interest" is defined in N.J.S.A. 52:27E-30 as:
An interest or right arising from the Constitution, decisions of court, common law or other laws of the United States or of this State inhering in the citizens of this State or in a broad class of such citizens.
With respect to the decision to represent a particular public interest, N.J.S.A. 52:27E-31 provides:
The Public Advocate shall have sole discretion to represent or refrain from representing the public interest in any proceeding. He shall consider in exercising his discretion the importance and the extent of the public interest involved and whether that interest would be adequately represented without the action of the department. If the Public Advocate determines that there are inconsistent public interests involved in a particular matter, he may choose to represent one such interest based on the considerations in this section, to represent no interest in that matter, or to represent one such interest through the Division of Public Interest Advocacy and another or others through other divisions of the department or through outside counsel engaged on a case basis.
A presumption of validity and constitutionality attaches to a statute duly enacted by the Legislature, and the party attacking such statute has the burden of overcoming this presumption. It is a heavy burden. Reingold v. Harper, 6 N.J. 182, 194 (1951). Nevertheless, in delegating powers to an administrative agency, the Legislature must establish reasonably adequate standards. Wilson v. Long Branch, 27 N.J. 360, 378 (1958).
It is to be noted that the Attorney General has been delegated almost the exact scope of power, but only in respect *94 to where the State is interested. N.J.S.A. 52:17A-4 reads in part:
The powers and duties of the Division of Law shall be the powers and duties now or hereafter conferred upon or required of the Attorney General, either by the Constitution or by the common and statutory law of the State, and as specifically but not exclusively as detailed herein, to wit:

* * * * * * * *
(c) Examine and decide all legal matters submitted to him by the Governor or the Legislature and act for them in any matter in which they may be interested, and shall exclusively attend to and control all litigation and controversies to which the State is a party or in which its rights and interests are involved;

* * * * * * * *
(g) Attend generally to all legal matters in which the State or any officer, department, board, body, commission or instrumentality of the State Government is a party or in which its rights or interests are involved; * * *.
It would appear that the Attorney General must determine whether the State is interested in any situation. The Public Advocate, on the other hand, must determine whether the public interest demands legal representation in various matters. While these powers are very broad, the Legislature has defined and limited them as much as possible without emasculating the office. The court may disagree with the theory of a Public Advocate with the vast powers he has been given, but that is not the test.
The Legislature obviously thought that there may be times when the state interest and public interest are not synonymous and that both interests needed a legal spokesman. The office of the Public Advocate is not unconstitutional and its function does not duplicate that of the Attorney General, although their positions may coincide in certain instances, as here, to a degree.
Defendant has argued that no public need has been shown. However, the question is not public need but rather public interest. The two concepts are not synonymous. The question is whether the rights of the public are being violated.
*95 Plaintiffs rely to a degree on the Supreme Court decision in Neptune City v. Avon, supra, 61 N.J. 296. There the court was presented with a situation in which Avon had dedicated its beach, that is, the dry sand area, to the use of the general public. Avon had been the recipient from the State of sand used for the beach. Nevertheless, Avon charged the nonresident beach-goer more than the resident beach-goer.
The court held that the tidal lands between the mean high and mean low water marks, as well as the ocean-covered land seaward, were owned by the State in fee simple, in trust for the people of the State, so that such people might enjoy the navigation, commerce, fishing and also bathing and swimming afforded by such area. Id. at 300, 304, 309. This was referred to (at 303) as the public trust doctrine, and the land as trust lands. The court (at 308) alluded to a possible right of access to those lands where the upland sand was not dedicated to the public use in general, but made no holding with respect thereto. What the court did hold was that where a municipality owns the upland sand and has dedicated it to the general public's use, then the public trust doctrine dictates that "the beach and the ocean waters must be open to all on equal terms." Id. at 309. Thus, the higher fees for nonresidents were struck down. The court also approved the holding in Brindley v. Lavallette, 33 N.J. Super. 344, 348-349 (Law Div. 1954), which relied upon the equal protection clauses to hold that an oceanfront municipality may not absolutely exclude nonresidents from the use of its dedicated beach, including, of course, land seaward of the mean high water mark.
The factual distinctions between Neptune City v. Avon, supra, and the situation now before the court are obvious. There is no access problem here since the general public may enter through the Pavilion or numerous streets ending at the beach and have access to the entire trust lands. Further, only the Pavilion beach has been dedicated to the use of the general public. The beach  that is, the dry sand area  of the Casino has been dedicated only to a portion *96 of the public, residents of Deal. The beach at the Casino may be distinguishable from the Avon and Lavallette beaches since the borough itself created most of the beach. In a sense, it is not a natural resource as one might consider such term, since the area was a bluff extending to the high water mark before 1956. The borough itself expended substantial sums to create what is presently a dry sand beach. The discrimination in the instant case surrounds the nonresidents' inability to use the upland sand of the Casino, the inability to use the improvements and pool of the Casino and the higher costs to nonresidents for seasonal use of a locker facility at the Pavilion. In spite of these distinctions the court must keep in mind Justice Hall's remarks in Avon:
* * * [A]t least where the upland sand area is owned by a municipality  a political subdivision and creature of the state  and dedicated to public beach purposes, a modern court must take the view that the public trust doctrine dictates that the beach and the ocean waters must be open to all on equal terms and without preference and that any contrary state or municipal action is impermissible. [61 N.J. at 308-309]
A municipality is merely a creature of the State and owes all its powers and, in fact, its very existence to the State. Jones v. MacDonald, 33 N.J. 132, 135 (1960); Stothers v. Martini, 6 N.J. 560, 563 (1951); Jersey City v. Martin, 126 N.J.L. 353, 361 (E. & A. 1941). A municipal corporation is a government of enumerated powers; it has no inherent jurisdiction to make laws or adopt regulations of government and must stay within its delegated authority. Ringlieb v. Parsippany-Troy Hills Tp., 59 N.J. 348, 351 (1971); Wagner v. Newark, 24 N.J. 467, 474 (1957); Grogan v. DeSapio, 11 N.J. 308, 321 (1953). Normally, municipal ordinances are presumed to be valid and must receive liberal construction. Moyant v. Paramus, 30 N.J. 528, 534 (1959); Toms River Pub. Co. v. Manasquan, 127 N.J. Super. 176, 179 (Ch. Div. 1974).
*97 It is the duty of a court to construe an ordinance so as to render it constitutional, if such a construction is reasonably susceptible. State v. Profaci, 56 N.J. 346, 350 (1970); Camarco v. Orange, 116 N.J. Super. 531, 534 (App. Div. 1971), aff'd 61 N.J. 463 (1972); Hurwitz v. Boyle, 117 N.J. Super. 196, 202 (App. Div. 1971). Legislative means employed to advance public health are entitled to a broad discretion. Amodio v. West New York Bd. of Comm'rs, 133 N.J.L. 220, 225 (Sup. Ct. 1945); Nutley v. Forney, 116 N.J. Super. 567, 575 (Cty. Ct. 1971). However, when a statutory power is exercised in a manner that is not, or could not have been, within the contemplation of the Legislature, such exercise of power must be restrained within proper bounds by being held void or as being ultra vires. Donohue v. Campbell, 98 N.J.L. 755, 763 (E. & A. 1923). A municipality must be especially careful to conform to statutory authorizations when dealing with real property. Anschelewitz v. Belmar, 2 N.J. 178, 183 (1949).
A municipality's powers in reference to the establishment of a public beach, park or pool are clearly set out. The governing body of any municipality may by ordinance regulate or prohibit swimming or bathing in the waters of the municipality and regulate the real property of the municipality. N.J.S.A. 40:48-1. Any municipality may make such other ordinances, regulations, rules and by-laws not contrary to the laws of this State or the United States as it may deem necessary and proper for the good government and for the preservation of public health and the welfare of the municipality and its inhabitants. N.J.S.A. 40:48-2.
The governing body of a municipality may acquire beaches for public resort and recreation and by ordinance make and enforce rules and regulations for the use of such beaches. N.J.S.A. 40:61-1. The governing body of a municipality bordering the Atlantic Ocean which owns lands bordering the ocean for use as a place of public resort shall have exclusive control thereof and may by ordinance make rules policing such lands, provided they are not in conflict with state law. *98 Reasonable fees may be charged for admission upon such lands. N.J.S.A. 40:61-22.20. The governing body of any municipality may construct and operate public swimming pools and such other recreational activities as it may determine to provide. N.J.S.A. 40:61-22.21. The commission form of government has all the powers necessary to govern and in common with general powers of all municipalities. N.J.S.A. 40:72-3. N.J.S.A. 40:92-7.1 sets out the same material as N.J.S.A. 40:61-22.20 but specifically in reference to a borough's powers to do such.
Chapter VI, § 6-2.2(b) and (i) of the Revised Ordinances of the Borough of Deal empowers the board of commissioners "to determine by resolution" the terms and requirements for membership in the Casino and to promulgate rules and regulations for the use, management and control of the club. N.J.S.A. 40:48-1, 40:61-1, 40:61-22.20 and 40:92-7.1 specify that such rules and regulations should be enacted by ordinance. The borough's action may possibly be supported by the general police powers, but since the Legislature specifically set out the manner in which these rules were to be enacted, all other methods should be considered improper by reason of the principle of statutory construction known as expressio unius est exclusio alterius. 2A Sutherland, Statutory Construction (4 ed. 1972), § 47.23 at 123. Therefore, such rules not enacted by ordinance are improper and of no effect.
Nevertheless, the court will move on to the other issues because (1) plaintiffs contend that regardless of this problem the stated policy of the borough as to the exclusion of nonresidents is clear and a declaration as to this is appropriate at this time, and (2) neither party relies upon such technical problem here and both seek resolution of the substantive issues.
The second issue is the higher fees charged nonresidents for a seasonal locker at the Pavilion. Deal argues that because the facilities were purchased by the borough the costs for nonresidents should be higher. The court *99 rejects such a view. Cf. Neptune City v. Avon, supra, 61 N.J. at 311. Actually, Deal's position is inconsistent. A nonresident pays the same charge as a resident for a day pass at the Pavilion and is afforded facilities to change, et cetera, which were also purchased by the borough. Further, Deal has dedicated the beach and facilities here to the general public's use, and such classification and discrimination with regard to nonresidents in this matter is improper. We extend the Avon holding here to include the view that where there is a municipal beach and facilities provided in conjunction therewith which have both been dedicated to the general public's use, then such beach, ocean and facilities must be open to all on equal terms.
The third issue concerns the pool, facilities and upland sand area of the Casino. The borough certainly has the power to construct a municipal pool, recreation center or park. N.J.S.A. 40:61-22.21; N.J.S.A. 40:72-3. In fact, most area communities, in some way or another, provide some municipal recreational facilities. The court is not, however, presented with the general question of whether any and all such operations can limit membership and use of the facilities to residents of the municipality. Such general question is left for another day. Here the issue is whether a municipal beach club, even one which provides access to the public's use of the trust lands, may limit membership to residents only. A municipal beach club, for our purposes, is one which lies adjacent to the trust lands.
Based upon two entirely different reasons, the court must hold that Deal may not so limit its membership in the Casino. The first reason is based upon municipal power. There is no authority which has been granted to Deal upon which it can base its exclusion of other residents of this State. Deal has constructed a public facility under the powers granted by the Legislature. No power has been delegated allowing Deal to define narrowly or limit what segment of the public may use those facilities. Such power was beyond the contemplation of the Legislature. Donohue v. *100 Campbell, supra, 98 N.J.L. at 763. We are all citizens of the State and any legislative authorization enabling municipalities to construct a park must mean one open to all citizens. Thus, Deal's policy is ultra vires.
The second basis is equal protection under N.J. Const. (1947), Art. I, par. 5. While municipalities have the power to establish reasonable classifications, such classifications must bear a rational relationship to a legitimate state end. McDonald v. Bd. of Elections, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). Here the legitimate state end is the general health and welfare of the public. The classification limiting the use of such facility only for the benefit of the local community is unreasonable and, thus, a denial of equal protection. Brindley v. Lavallette, supra, 33 N.J. Super. at 348.
Therefore, the Casino and Pavilion must be open to the entire public on equal terms. This includes the pool, restaurant, beach, ocean, cabanas, et cetera.
The fact that Deal spent large sums to level a bluff and created a sandy expanse of usable beach is irrelevant to the question of who may enjoy the created beach. The amount that it cost Deal might be very relevant if the charges made were being challenged, but they are not under attack in this action.
There must be daily rates for the Casino as well as the Pavilion up to a safe limit of people. The lockers at the Pavilion and the bathhouses and cabanas at the Casino will be available for nonresidents on the same basis as for residents. As to all of the available facilities, nonresidents will be treated the same as residents. Applications will not be sent out to anyone except upon written request. They may be picked up at the municipal offices in person. They will be accepted with payment until June 1. Within the next week a drawing will be held to allocate the facilities. There will be no facility held out, even for the commissioners. Within one week of these drawings the money of the unsuccessful *101 applicants will be returned and the successful applicants will be notified. The court will look with a jaundiced eye at any attempt to avoid the intent and spirit of this ruling through the use of legal technicalities such as we are seeing being employed in the zoning field in the wake of South Burlington Cty. NAACP v. Mt. Laurel Tp., 67 N.J. 151 (1975). Of course, the trust lands east of the mean high water mark, including the ocean, must be open to all, as Deal has made it this year.
It is as important to point out what this opinion does not reach as what it does reach. It has no effect on any municipal recreational facility not abutting trust lands. It has no effect on private properties abutting trust lands  for example, Ship Ahoy, the former Sandlass, and Driftwood, all in Sea Bright, the Sea Bright Beach Club, Monmouth Beach Club, or Elberon Bathing Club. These facilities are not dealt with here.
It has no effect on limiting the dry sand area and facilities of the Casino to use by those who are admitted through the Casino. Of course, the same applies to the dry sand area and facilities of the Pavilion.
There was a failure of proof of the expenditure of state monies for private purposes.
While this decision is limited solely to municipal facilities abutting trust lands, the holding is not based on the trust doctrine as applied to the dry sand area but upon municipal power and equal protection.
There will be a declaratory judgment that Deal is discriminating illegally against nonresidents, as set forth above, and an injunction enjoining the continuation of such practices and establishing the practice that will be followed in the coming years insofar as applications are concerned.
No costs will be taxed.