145 N.J. Super. 368 (1976)
367 A.2d 1191
STANLEY C. VAN NESS, PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, AND ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, PLAINTIFF-INTERVENOR,
v.
BOROUGH OF DEAL ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 1976.
Decided December 20, 1976.
*370 Before Judges BISCHOFF, MORGAN and E. GAULKIN.
Mr. Thomas L. Morrissey argued the cause for appellants (Messrs. Carpenter, Bennett & Morrissey, attorneys; Messrs. Michael S. Waters and Rudy B. Coleman on the brief).
Mr. Robert P. Corman, Assistant Deputy Public Advocate, argued the cause for respondent (Mr. Stanley C. Van Ness, Public Advocate, attorney).
Mr. Michael S. Bokar, Deputy Attorney General, argued the cause for intervenor (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
The opinion of the court was delivered by MORGAN, J.A.D.
This appeal concerns (1) the power of a shore municipality to limit use of a municipally-owned beach club to residents of that municipality, and (2) the power of such municipality to exclude nonresidents from that portion of the dry sand area, upland of public trust lands, reserved for the exclusive use of residents as part of the beach club. The trial judge's findings of fact, reflected in its opinion reported at 139 N.J. Super. 83 (Ch. Div. 1975), have not been challenged in this appeal, are accepted by us as being evidentially supported and, without being repeated herein, provide the factual basis for this opinion. Since the date of that opinion, however, the municipality, by ordinance, has equalized the fees charged to residents and nonresidents for seasonal use of the Phillips Avenue Pavilion (Pavilion) lockers, and hence the issue concerning discriminatory fees for such locker use has become moot and will receive only incidental mention in this opinion.
*371 Several significant aspects of the factual background to this controversy, however, deserve emphasis so as to clarify the context in which the issues raised will be resolved. This case does not involve an alleged impairment of access to public trust lands  that is, the wet sand area between mean low and mean high tide, either in front of the Deal Casino (Casino) or the Pavilion. It is undisputed that Deal affords the general public fully sufficient access to such lands. Nor does this case concern an alleged interference with the public's access to locker room or other changing or toilet facilities reasonably necessary for enjoyment of public trust lands. Here, too, it is undisputed that such facilities in the Pavilion, fully sufficient in nature, are freely available to the general public and, under the ordinance adopted since the trial court opinion, on terms equal to those afforded residents. Indeed, in addition to insuring access to all of the public trust lands within its boundaries, Deal makes available to the general public its own bathing beach immediately in front of the Pavilion, the facility which provides the changing and toilet facilities for its convenient use, and use of 50 feet of the dry sand beach upland of the public trust lands in front of the Casino itself. Hence, the only areas from which the general public is excluded are the Casino facilities themselves and the stretch of dry sand immediately in front of it, a 420' x 240' rectangle, west of the public trust lands, reserved for the exclusive use of Casino members. These two areas, the Casino and the dry sand beach used in conjunction with it, are the exclusive concern of this opinion.
The principal issue considered, as framed by the trial judge, was "whether a municipal beach club, even one which provides access to the public's use of the trust lands, may limit membership to residents only." 139 N.J. Super. at 99. During the course of his opinion, however, the judge expanded this issue to encompass exclusion of the general public from the upland sand area of the Casino as well, the 420' x 240' rectangle referred to above. With respect to both the beach and the Casino, the judge held that a shore *372 community, such as Deal, could not do so. Two reasons were given in support of this holding. The first was based upon a lack of municipal power to exclude nonresidents from the rectangle or Casino. "There is no authority which has been granted to Deal upon which it can base its exclusion of other residents of this State." Id. Deal's policy was regarded as being ultra vires.
The second reason was that excluding nonresidents from Casino membership and use of the adjacent rectangle offends the Equal Protection Clause of the New Jersey Constitution. N.J. Const. (1947), Art. I, par. 5. The classification based upon residency was viewed as unreasonable, bearing no rational relationship to the legitimate state goal of providing for the general health and welfare of the public, and thus constituted a denial of equal protection. The public trust doctrine was expressly rejected as a basis for the judge's conclusions since general access to public trust lands, as noted previously, remains unimpaired.
Accordingly, the trial judge ordered that the Casino, and all its facilities including the rectangle, be open to the general public on the same terms as those available to residents. A lottery for membership was ordered. Applications for membership were to be sent to anyone requesting one, and on a scheduled date a drawing was to be held to determine which applicants would be given membership. Those losing in the lottery would be refunded the proffered membership fees. Deal appeals.

The Deal Casino
As is apparent from the trial judge's findings of fact, the Deal Casino is a fairly elaborate facility located immediately adjacent to the beach area in Deal and designed to be used by its membership in conjunction with the beach on which it sits and which its facilities partially occupy. It consists of a 350-car parking lot, an olympic pool and infants' pool, 484 changing facilities comprising small and *373 deluxe bathhouses and regular and beach cabanas, three ladies' rooms, three men's rooms, one boys' room and one girls' room, a snack bar and restaurant, and recreational facilities including shuffleboard, ping pong, basketball and tetherball. Its construction in 1954-1956 was financed by a bond issue; "subsequent improvements were financed by municipal revenues, bond anticipation notes, capital improvement funds and Fiscal Assistance Act Funds." 139 N.J. Super. at 88. The site upon which the Casino now stands, apparently acquired by foreclosure proceedings and by outright purchase, was originally a bluff standing 20 to 30 feet above sea level, with high tides washing the base of the bluff, affording no usable bathing beach. The Casino site, prepared by a substantial engineering effort necessitating the approximate expenditure of $780,000, required the bulldozing of the bluff and the creation of a sand beach on property upland of the mean high water mark. Although the Casino is located immediately adjacent to the dry sand beach created by the town, it does not, strictly speaking, abut the public trust area since 50 feet upland of the mean high water mark has been dedicated to general public use.
The Casino obviously has a limit to the number of members it can accommodate. In 1974 approximately 2,450 members used the Casino facilities, with 356 persons in cabanas, 131 persons in beach houses, 1,327 in deluxe bath houses and 640 in small bath houses. The record reflects that the available facilities are fully utilized by local residents and that in recent years there has been a tendency toward its over-utilization.
The trial court entertained no doubt as to the power of Deal to build and operate the Casino as a municipal enterprise. N.J.S.A. 40:61-22.21 and N.J.S.A. 40: 72-3. See also, Lander v. South Orange, 58 N.J. 509, 517 (1971); Biglin v. West Orange, 46 N.J. 367, 373-74 (1966). Indeed, it recognized the prevalence of municipally-owned recreational facilities throughout the State. Given the authority of Deal to install and operate its beach club, *374 if the residency qualification for membership eligibility is a reasonable one, then it must be upheld regardless of whether there exists specific statutory authorization for that classification. Determining qualifications for use of a municipal swimming facility is clearly an incident of the power to regulate it, an auxiliary power in aid of a specific grant of power. N.J.S.A. 40:61-22.21; Inganamort v. Fort Lee, 62 N.J. 521, 535-36 (1973). If, on the other hand, the classification bears no reasonable relationship to legitimate municipal goals, then it must fall and the exclusionary policy of Deal would fall with it regardless of specific authorization therefor.
Both the New Jersey Constitution and the Home Rule Act mandate liberal construction of the powers delegated to municipalities for the purpose of giving such municipalities "the most complete powers possible" over their internal affairs. N.J.S.A. 40:42-4. See also N.J. Const. (1947), Art. IV, § 7, par. 11. As the law now stands, any municipality, in addition to any powers elsewhere more specifically granted, has authority to take such action "as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants," limited only by constitutional or statutory prohibitions. N.J.S.A. 40:48-2. See also Fred v. Old Tappan, 10 N.J. 515, 520 (1952); Inganamort v. Fort Lee, supra at 536.
State constitutions and statutes, including our own, frequently accord a preference, or condition access to some governmental right or privilege, on the basis of state, county or municipal residency. See e.g., N.J. Const. (1947), Art. II, par. 3 (voter must reside in State and county 30 days); N.J.S.A. 18A:64A-32 (public members of county community college commission must be county residents); N.J.S.A. 34:9-2 (giving preference to state residents in employment on public works project); N.J.S.A. 40:46-14 (municipal officers must be bona fide residents thereof). *375 Indeed, the very statute specifically permitting municipalities to construct, operate, maintain and regulate public swimming pools and other recreational facilities authorizes delegation of the supervision of such facilities to a five-member board of commissioners who are required to be residents of the municipality. N.J.S.A. 40:61-22.24.
Classifications based upon residency are not inherently suspect. Both the Supreme Court of the United States and the courts of this State have held that a state or lesser political subdivision may, when reasonable, constitutionally differentiate between residents and nonresidents in providing access to some right, privilege or benefit. See e.g., McCarthy v. Philadelphia Civil Serv. Comm'n, 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed. 2d 366 (1976) (city may require police officers, firemen and other municipal employees to be continuing residents); Abrahams v. Civil Serv. Comm'n, 65 N.J. 61 (1974) (same); Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (upholding statute requiring one year's residency in state as precondition to filing petition for divorce); Vlandis v. Kline, 412 U.S. 441, 452-53, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (state may impose bona fide residency requirement and reasonable durational residency requirement as condition of eligibility for lower tuition fees); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (states may require voters to be bona fide residents of particular political subdivision); Worden v. Mercer Cty. Bd. of Elections, 61 N.J. 325 (1972) (same). See also Mathews v. Diaz, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) (Congress may condition alien's eligibility for Medicare benefits on continuous residence in United States for five years and admission for permanent residence); DeCanas v. Bica, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) (upholding California criminal statute prohibiting employers from knowingly employing aliens not entitled to lawful residence in United States if such employment would have adverse effect on lawful resident workers); Salyer Land Co. v. Tulare Water District, *376 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) (upholding statute limiting right to vote in water storage district general election to district landowners and apportioning votes according to assessed valuation of owned land).
Courts have recognized as a legitimate basis for a residence-based classification the fact that the facilities to be limited to residents' use have been developed and maintained through local taxes or bonds financed by residents of a particular governmental unit. See Starns v. Malkerson, 326 F. Supp. 234, 240-41 (D. Minn. 1970), aff'd 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971). A further justification of classification based on residency derives from the broad constitutional and statutory authority accorded municipalities to provide for the health, welfare and safety of their inhabitants. N.J. Const. (1947), Art. IV, § 7, par. 11; N.J.S.A. 40:42-4; N.J.S.A. 40:48-2. Municipalities might well be disabled from doing so were nonresidents to displace residents in the enjoyment of local facilities of limited capacity. Hence, in New Jersey the powers of a municipal corporation have been regarded as being of a two-fold character: with respect to certain activities the municipality acts for the public at large, as agent of the State Government; in its other capacity, a private one, it acts primarily to provide local necessities and conveniences for its own citizens. Weeks v. Newark, 62 N.J. Super. 166, 179 (App. Div. 1960), aff'd o.b. 34 N.J. 250 (1961). In Weeks the court observed:
The operation of a swimming pool is an activity which a municipality provides for its citizens more as a matter of local convenience than in the exercise of some duty discharged on behalf of the State with consequent benefits accruing to the State as a whole. It is a service which could just as well be provided by a private corporation, and very often is. [at 180; emphasis supplied]
In East Orange v. Board of Water Com'rs., etc., 41 N.J. 6 (1963), East Orange had leased public water reserve lands *377 to a nonprofit association for the construction and operation of a golf course "for the sole use of the residents of the City of East Orange and their guests." At 9. For many years only a small proportion of the association's members were city residents, and some residents were denied membership. The court found such activities to be in breach of the lease and affirmed the trial court judgment for forfeiture and ouster. Justice Jacobs commented:
The purpose of the arrangement was to make an athletic and recreational facility available to East Orange citizens  not just some chosen few of them but all of them. The very phraseology of the lease evidenced the public nature of the arrangement and the fixing of the annual rent at the nominal sum of $1.00 displayed the undoubted understanding that the vital consideration to the city was the public benefit to its citizens as a whole. [at 16].
Although the question of East Orange's authority to limit use of the golf course to its residents was not squarely raised, the court at least tacitly recognized that it existed. There, too, the golf course had limited capacity to accommodate those wishing to use it and nonresidents were displacing residents in its enjoyment. Nowhere does the opinion suggest that giving paramount consideration to a municipality's own residents was impermissible and in excess of municipal power. The fact that East Orange was an inland, as distinguished from a shore community, is irrelevant. Contrary to the position taken by the Public Advocate, there is no statutory or case authority whatever even suggesting that shore communities possess lesser power to provide for their citizens' recreational needs.
In McClain v. South Pasadena, 155 Cal. App.2d 423, 318 P.2d 199 (D. Ct. App. 1957), a case involving exclusion from a municipal swimming pool allegedly on the basis of race, the court found that plaintiff was denied admission by reason of nonresidency rather than for race and accordingly affirmed dismissal of the complaint. 318 P.2d at 210. In holding that the exclusion of nonresidents in the given circumstances offended neither the Equal Protection Clause of *378 the 14th Amendment to the United States Constitution nor the analogous provision of the California Constitution, the court found the reasonableness of the classification based on residency in the avoidance of congestion in the use of the pool, in the "proper distribution of patrons; and for the better protection, safety, comfort, convenience, and health of persons using it." 318 P.2d at 209. See also Schreiber v. City of Rye, 53 Misc.2d 259, 278 N.Y.S.2d 527 (Sup. Ct. 1967).
Applying the foregoing law to the present case it is clear that the challenged classification based upon residency as the predicate for membership in the Deal Casino is indeed a reasonable one and offends neither the New Jersey nor the Federal constitutional guarantees of equal protection of the law. The Casino is, as previously noted, a limited capacity facility. Only a small fraction of the total population of the State can be accommodated therein. Conversely, the largest number of the inhabitants of this State will of necessity be excluded from its use. The question, then, is the basis for deciding which person shall be granted membership and which person denied it. The trial judge decided that mere chance should determine eligibility for membership, disregarding the financial investment by citizens of Deal in the creation and maintenance of the Casino. Deal, on the other hand, concluded that residence in Deal should be the basis for determining the few people to be granted membership. We have little difficulty in concluding that Deal's approach is clearly the more reasonable one. Since the Casino cannot accommodate all, it seems both reasonable and just that preference be accorded those who contributed to its creation and continue to contribute to its maintenance.
Moreover, we question the essential wisdom of requiring all improvements, whatever their character, located near or even abutting bathing beaches, to be made available to the general population of the State even to the extent of limiting or foreclosing their local use. The almost inevitable result of such a holding would be a reluctance of the taxpaying *379 residents to develop new facilities and diminished motivation to maintain existing ones. One could well understand local resistance to expending tax dollars for the benefit of persons who have no stake in the future of the community beyond that of utilizing, during the summer months, the local swimming pool and athletic facilities, particularly when the residents might find themselves excluded from similar enjoyment. Shore communities would indeed be hampered in providing for the health and recreational needs of their inhabitants.[1]
For the foregoing reasons we therefore conclude that the trial court was in error in mandating a policy of open admission to Casino membership regardless of residency.

The Upland Beach Area
The issue concerning the limitation on the use of the rectangular beach area immediately in front of the Casino upland of the public trust area depends, first, on whether Deal ever dedicated that beach to the general public's use. If the beach had ever been so dedicated, then any attempt to limit its exclusive use to residents must be held invalid. Borough of Neptune City v. Borough of Avon-by-the-Sea, 61 N.J. 296, 308-09 (1972); see also Gewirtz v. Long Beach, 69 Misc.2d 763, 330 N.Y.S.2d 495, 507-08 (Sup. Ct. 1972).
In this respect the record seems clear. The beach immediately in front of the Casino has always been reserved for the exclusive use of Deal residents. During oral argument counsel for Deal represented, without contradiction, that this restriction has been enforced by means of chains and guards, excluding nonresidents from use of this portion of the beach. *380 The record is barren of any suggestion that this portion of the beach had ever been dedicated to general public use.
The rectangle is part of and appurtenant to the Casino, as are the Casino's parking, sports, pool and other areas. Cabanas are maintained on it. It does not encroach on public trust lands and is not necessary for the general public's access thereto or enjoyment thereof. See Neptune City, supra at 307-09. The Attorney General as intervenor (who appears to agree that the use of the Casino may be limited to residents) argues that "irrespective of whether a municipally-owned beach has been dedicated to the public, the municipality must, at a minimum, make available to municipal residents and nonresidents alike, on a non-discriminatory basis, such portion of its beach as is necessary for reasonable enjoyment of the public trust area. * * * a reasonable portion of the beach must be set aside for public use." This Deal has done. The intervenor adds, "Even apart from dedication, the establishment of the barrier 50 feet from the mean high water mark would be subject to attack if it could be shown, either presently or in the future, that the portion of the beach made available for the use of the general public was insufficient for full enjoyment of the public trust area." We need not now rule on the validity of this contention, for the evidence established that the public area is presently sufficient.
Since the rectangle was designed to be used as part of the Casino, limiting its use to members of the Casino is not arbitrary, capricious or otherwise unconstitutional for the reasons above set forth which support the validity of the limitation of the use of the remainder of the Casino to members.
Reversed.
NOTES
[1] "The beneficial value of a swimming pool to a well-balanced municipal recreational program" was recognized in Biglin v. West Orange, supra at 372. The trial court opinion would, in our view, compromise the efforts of shore communities to provide this benefit for its inhabitants.