247 N.J. Super. 146 (1991)
588 A.2d 1227
IN RE PETITION FOR SUBSTANTIVE CERTIFICATION FILED BY THE TOWNSHIP OF WARREN.
Superior Court of New Jersey, Appellate Division.
Argued October 17, 1990.
Decided March 26, 1991.
*154 Before Judges SHEBELL, HAVEY and SKILLMAN.
Stephen Eisdorfer, Assistant Deputy Public Advocate, argued the cause for appellant Department of the Public Advocate (Wilfredo Caraballo, Public Advocate, attorney; Stephen Eisdorfer and Susan R. Oxford, Assistant Deputy Public Advocate, on the brief).
Geraldine Callahan, Deputy Attorney General, argued the cause for respondent Council on Affordable Housing (Robert J. Del Tufo, Attorney General, attorney; Michael R. Clancy, Assistant Attorney General and Mary Jacobson, Deputy Attorney General, of counsel; Geraldine Callahan and Donald M. Palombi, Deputy Attorney General, on the brief).
Richard P. Flaum argued the cause for respondent Township of Warren (Kunzman, Coley, Yospin & Bernstein, attorneys; John E. Coley, Jr., of counsel; Richard P. Flaum and Sandra Belli, on the brief).
James M. Cahill, Assistant City Attorney, argued the cause for respondent City of New Brunswick (William J. Hamilton, Jr., City Attorney, attorney; Margery S. Golin, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
The Public Advocate appeals from a final decision of the Council on Affordable Housing (COAH) granting substantive certification pursuant to N.J.S.A. 52:27D-314 to the housing element and fair share plan of Warren Township (Warren).
*155 This proceeding was initiated by a property owner filing an action in the Law Division alleging that Warren's zoning ordinances fail to provide a reasonable opportunity for the construction of housing affordable to lower income households and are therefore unconstitutional under the Mount Laurel doctrine. See Southern Burlington Cty. NAACP v. Township of Mount Laurel, 67 N.J. 151, 336 A.2d 713 (Mount Laurel I), appeal dismissed and cert. den., 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975), and 92 N.J. 158, 456 A.2d 390 (1983) (Mount Laurel II). After enactment of the Fair Housing Act of 1985 (FHA), N.J.S.A. 52:27D-301 to -329, the Supreme Court held that Warren was entitled to transfer the case to COAH. Hills Dev. Co. v. Township of Bernards, 103 N.J. 1, 47-56, 67-68, 510 A.2d 621 (1986). COAH treated Warren's motion for transfer as a petition for substantive certification, see id. at 38 n. 10, 510 A.2d 621, and the Public Advocate filed objections to the petition. COAH rejected the Public Advocate's objections and granted substantive certification to Warren's fair share plan.
COAH determined that Warren's fair share of housing affordable to lower income households is 367 units. Warren's certified fair share plan provides for the satisfaction of this obligation through the rehabilitation of 34 indigenous substandard units, the construction of 145 new units, of which 88 will be set-aside units built in inclusionary developments and 57 will be lower income units built on land owned by Warren, the execution of a regional contribution agreement (RCA) under which Warren will pay $4,399,000 to the City of New Brunswick for the construction or rehabilitation of 166 lower income units in New Brunswick and a 22 unit rental bonus credit for 66 units which will be rented to lower income persons.[1] Warren's fair share plan further provides, as permitted by COAH's regulations, *156 that households which presently reside in Warren or which have a member who works in Warren shall be granted an occupancy preference with respect to the purchase or rental of new lower income housing constructed in the municipality.
The Public Advocate argues that Warren's RCA with New Brunswick and the occupancy preference violate the Mount Laurel doctrine by perpetuating exclusionary zoning and violate constitutional and statutory prohibitions against racial discrimination by perpetuating racial stratification within the housing region in which Warren is located.[2] The Public Advocate also argues that COAH's standards of affordability for Mount Laurel housing violate the Mount Laurel doctrine by not providing a realistic opportunity for the construction of housing affordable to households earning less than 40% of the median household income in the region. We reject these arguments and therefore affirm COAH's decision granting substantive certification to Warren's fair share plan.[3]

I
Before discussing the Public Advocate's challenge to Warren's fair share plan, we must consider several preliminary procedural arguments presented by COAH and the Public Advocate.

*157 A
COAH contends that the Public Advocate's appeal should be dismissed because it constitutes an untimely collateral attack upon regulations adopted in 1986. The Public Advocate responds that the appeal does not challenge the validity of COAH's regulations on their face but only as applied in Warren's fair share plan.
We agree with COAH that this appeal is in essence a collateral attack upon its regulations, because the practical effect of a decision in the Public Advocate's favor would be to invalidate COAH's regulations or at least to severely limit their scope of operation. Thus, the Public Advocate's argument that Warren's plan fails to provide housing affordable to households with income below 40% of the median income in the region is a direct challenge to N.J.A.C. 5:92-14.2, which requires a municipality to insure that lower income units are affordable to households with income ranging from 40% to 80% of regional median income. Similarly, the Public Advocate's argument that the occupancy preference authorized by N.J.A.C. 5:92-15.1 is exclusionary and racially discriminatory would appear equally applicable to most suburban municipalities that adopt fair share plans which include an occupancy preference. And the Public Advocate's argument that the RCA between Warren and New Brunswick is exclusionary and racially discriminatory, because it results in a shift of lower income housing from a municipality with a small number of lower income households and few minority residents to a municipality with a high percentage of lower income households and minorities, would be equally applicable to almost any other agreement likely to be entered into pursuant to COAH's regulations.[4]
*158 But while we agree with COAH's characterization of this appeal as a collateral attack on the validity of the agency's regulations, it does not follow that the appeal should be dismissed as untimely. Generally, the 45-day limit on appeals from final decisions of state agencies imposed by R. 2:4-1(b) does not apply to challenges to the validity of regulations. Bergen Pines County Hosp. v. New Jersey Dep't of Human Servs., 96 N.J. 456, 471 n. 10, 476 A.2d 784 (1984). We recognize that an appeal challenging the validity of a regulation may be dismissed if the appellant fails to participate in the proceeding resulting in its adoption or fails to file a timely notice of appeal, and the regulation is subsequently relied upon by affected parties. Id. at 474-76, 476 A.2d 784. We also recognize that the Public Advocate did not object to COAH's regulations at the time they were proposed and did not file a prompt appeal challenging their validity. Furthermore, Warren and other affected municipalities have relied upon the regulations in developing their fair share plans. In fact, the Public Advocate did not move for a stay of COAH's grant of substantive certification to Warren, and we were advised at oral argument that Warren has now substantially implemented its fair share plan by, among other things, distributing several million dollars to New Brunswick in accordance with the terms of the RCA. Nevertheless, the Public Advocate's appeal raises the kind of important public questions of general applicability which the courts are reluctant to dismiss on the ground of untimeliness. See Township of Franklin v. Board of Educ. of N. Hunterdon Reg. High School, 74 N.J. 345, 347-48, 378 A.2d 218 (1977), cert. den., 435 U.S. 950, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978). In addition, to a limited extent the Public Advocate's arguments go beyond simply challenging COAH's regulations. Moreover, any possible prejudice to Warren or New Brunswick from the Public Advocate's untimely challenges to COAH's regulations could be obviated by appropriate limitations on the scope of relief in the event the Public Advocate *159 were to prevail. Consequently, we conclude that this appeal should not be dismissed as untimely.

B
The Public Advocate argues that Warren's petition for substantive certification should have been referred to the Office of Administrative Law (OAL), because N.J.S.A. 52:27D-315(c) requires referral if mediation is unsuccessful, regardless of whether there is a contested factual issue. However, we rejected this same argument in Hills Dev. Co. v. Township of Bernards, 229 N.J. Super. 318, 340-41, 551 A.2d 547 (App.Div. 1988) and the Public Advocate has not presented any persuasive reason for us to reconsider that conclusion. Although N.J.S.A. 52:27D-315(c) describes the obligation to refer to the OAL in mandatory terms, it does so by express incorporation of the Administrative Procedure Act. In our view, this incorporation encompasses N.J.S.A. 52:14F-7, which authorizes the agency with ultimate decision making authority "to determine whether a case is contested."
This conclusion is supported by the legislative history of the FHA. The fair housing bill originally passed by the Legislature expressly provided that COAH's review process should not be considered a "contested case." The bill went on to state: "Any appeal of a council decision granting or denying substantive certification shall be to a trial court, which shall conduct an adjudicatory hearing." However, this bill was conditionally vetoed by Governor Kean in part because:
The bill as currently drafted creates a novel mediation and review process and specifically provides that the review process should not be considered a contested case under the Administrative Procedure Act, subject to the procedures of that act and a hearing by an administrative law judge. If mediation and review by the housing council is unsuccessful, the matter will be heard in the trial court of the Superior Court.
I recommend, in place of the special procedures set forth in this bill, the regular administrative law procedure. Under this approach, if the mediation by the council is unsuccessful, the dispute will be transferred to the Office of Administrative Law as a contested case for a hearing pursuant to its rules. *160 [Governor's Conditional Veto Message Regarding Senate Committee Substitute for Senate Bill 2046 and Senate Bill 2334, p. 7 (April 26, 1985)].
The key point of this conditional veto message was the Governor's insistence that COAH's certification proceedings follow "regular administrative law procedure," which includes a discretionary determination by the agency head, here COAH, whether a matter involves contested material issues of fact requiring an evidentiary hearing. See In re Uniform Admin. Procedure Rules, 90 N.J. 85, 105, 447 A.2d 151 (1982).
We also agree with COAH's conclusion that the Public Advocate's objections to Warren's fair share plan do not present any contested material factual issue. Those objections are based on 1980 census data which show, among other things, that a smaller percentage of lower income households reside in Warren than the average in the region, that little affordable housing currently exists in Warren, that New Brunswick has a disproportionately large percentage of lower income households, that Warren has a smaller percentage of blacks and hispanics than the average in the region and that the percentage of these minorities residing in New Brunswick exceeds the regional average. None of this factual data is disputed by respondents. Consequently, the Public Advocate's various challenges to COAH's regulations and Warren's fair share plan adopted in conformity with those regulations rest on uncontested facts. Under these circumstances, an evidentiary hearing is unnecessary. See In re Solid Waste Util. Customer Lists, 106 N.J. 508, 517, 524 A.2d 386 (1987) ("It is only when the proposed administrative action is based on disputed adjudicative facts that an evidentiary hearing is mandated"); see also Van Dalen v. Washington Tp., 120 N.J. 234, 245, 576 A.2d 819 (1990).

C
For substantially the same reasons, we reject the Public Advocate's argument that COAH failed to make adequate findings of fact and did not give sufficient reasons for overruling the Public Advocate's objections to Warren's fair *161 share plan. An administrative agency is required to provide an adequate explanation of the basis of its decision. Riverside Gen. Hosp. v. New Jersey Hosp. Rate Setting Comm'n, 98 N.J. 458, 468-69, 487 A.2d 714 (1985). But where there are no contested material issues of fact, an agency is not required to repeat or even summarize evidential data. "It is sufficient if it can be determined from the [agency's decision] without question or doubt what facts and factors led to the ultimate conclusions reached." Id. at 469, 487 A.2d 714 (quoting In re Howard Sav. Inst. of Newark, 32 N.J. 29, 53, 159 A.2d 113 (1960)).
Although COAH did not respond directly to the Public Advocate's objections to Warren's fair share plan, it adequately responded to substantially the same objections in an opinion dated March 21, 1988 issued in connection with Holmdel Township's fair share plan.[5] That opinion notes that RCAs and occupancy preferences are sanctioned by law and are likely to create affordable housing where it did not exist previously. The opinion further notes that the FHA only permits a sending municipality to transfer a maximum of 50% of its obligation to a receiving municipality. The opinion also notes that the occupancy preference is limited to 50% of lower income units constructed within a municipality and includes individuals who work in the municipality and presently reside elsewhere. Thus, COAH clearly explained its reasons for rejecting the Public Advocate's objections to Holmdel's fair share plan, which are essentially the same as his objections to Warren's plan. Most importantly, the Public Advocate's objections are essentially legal in nature and therefore can be passed upon by this court *162 without requiring COAH to make additional findings of fact and conclusions of law.

II
Regional contribution agreements (RCAs) are expressly authorized by the FHA, which provides in pertinent part that "[a] municipality may propose the transfer of up to 50% of its fair share to another municipality within its housing region by means of a contractual agreement into which two municipalities voluntarily enter." N.J.S.A. 52:27D-312(a). COAH is required to approve an RCA if it finds that "the agreement provides a realistic opportunity for low and moderate income housing within convenient access to employment opportunities, and that the agreement is consistent with sound, comprehensive regional planning." N.J.S.A. 52:27D-312(c). These requirements are mirrored in COAH's regulations. N.J.A.C. 5:91-12.3(c).
The Public Advocate challenges the RCA between Warren and New Brunswick on two grounds: first, that it violates the Mount Laurel doctrine because it will shift the location of proposed Mount Laurel housing from a municipality which has virtually no lower income housing to a municipality which already has a disproportionate share of the region's lower income households, and second, that it violates constitutional and statutory prohibitions against racial discrimination because it will result in the construction of new lower income housing in a municipality which has a disproportionately large number of minorities rather than one which has virtually no minority population.

A
In Hills Dev. Co. v. Township of Bernards, supra, the Supreme Court held that RCAs are consistent with the Mount Laurel doctrine. The Court noted that the provisions of the FHA authorizing RCAs
seem intended to allow suburban municipalities to transfer a portion of their obligation to urban areas (see § 2g, evincing a legislative intent to encourage *163 construction, conversion, or rehabilitation of housing in urban areas), thereby aiding in the construction of decent lower income housing in the area where most lower income households are found, provided, however, that such areas are "within convenient access to employment opportunities," and conform to "sound comprehensive regional planning." § 12c. [103 N.J. at 38, 510 A.2d 621].
The Court also noted its general agreement with the reasoning of the lower court's opinion, id., at 47 n. 13, 510 A.2d 621, which stated:
There are three reasons why this attack upon the validity of the act must be rejected. First, the transfer provision is limited to a maximum of 50% of a municipality's fair share obligation. Therefore, it does not permit a municipality to remain solely an enclave for the rich and middle class. Second, the Court has never said that a municipality's fair share obligation may not be transferred to another municipality. Indeed, it intimated in Mount Laurel I that such a transfer might be appropriate:
Frequently it might be sounder to have more of such housing, like some specialized land uses, in one municipality in a region than in another, because of greater availability of suitable land, location of employment, accessibility of public transportation or some other significant reason. But, under present New Jersey legislation, zoning must be on an individual municipal basis, rather than regionally. So long as that situation persists under the present tax structure, or in the absence of some kind of binding agreement among all the municipalities of a region, we feel that every municipality therein must bear its fair share of the regional burden. [67 N.J. at 189, 336 A.2d 713]
This view of the Mount Laurel doctrine was cited with apparent approval in Mount Laurel II. 92 N.J. at 237-238 [456 A.2d 390]. Therefore, the transfer provisions of the act may be considered an authorization for "binding agreements" between municipalities which may result in a regional zoning plan for lower income housing which is "sounder" than such zoning "on an individual municipal basis." Third, any proposal to transfer part of a municipality's Mount Laurel obligation to another municipality must be approved by the council, which must determine that "the agreement provides a realistic opportunity for low and moderate income housing within convenient access to employment opportunities, and ... is consistent with sound comprehensive regional planning." L. 1985, c. 222, § 12(c). It must be assumed that the council will exercise this approval power in a manner which appropriately implements the objectives of the Mount Laurel doctrine. [Morris Cty. Fair Hous. Council v. Boonton Tp., 209 N.J. Super. 393, 431-32, 507 A.2d 768 (Law Div. 1985)].
Despite the Court's unequivocal holding in Hills that the statutory authorization for RCAs is constitutional, the Public Advocate contends that "[a] regional contribution agreement between a municipality that has few housing opportunities for poor people and one that already has an over-concentration of *164 poor people thus fosters and perpetuates a destructive pattern of economic segregation that the constitutional prohibition on exclusionary zoning seeks to undo." The Public Advocate disclaims any intent to attack the constitutionality of N.J.S.A. 52:27D-312. Instead, he rests his argument upon the requirement of N.J.S.A. 52:27D-312(c) that an RCA must be "in accordance with sound, comprehensive regional planning," and the finding set forth in N.J.S.A. 52:27D-302(g) that "the provision of housing in urban areas must be balanced with the need to provide housing throughout the State for the free mobility of citizens."
However, the express legislative authorization for a municipality to satisfy up to 50% of its fair share housing obligation through an RCA clearly indicates that the Legislature considered such an agreement to be consistent with "sound, comprehensive regional planning" and the appropriate balance between the public need to construct and rehabilitate housing in urban areas and the need to provide affordable housing in suburban areas. Furthermore, it is clear that both the Legislature and the Court in Hills contemplated that RCAs would involve the transfer of lower income housing units from relatively wealthy suburban municipalities to urban municipalities with high concentrations of lower income households. Indeed, the essential purpose of RCAs is to promote the rehabilitation of the housing stock of urban areas occupied by lower income households.
Moreover, the record reveals that the particular RCA between Warren and New Brunswick makes good planning sense. Warren is a sprawling suburban municipality with no public transportation and with employment opportunities limited to an area along Route 78. On the other hand, New Brunswick is well served by bus and rail transit which provides ready access to employment opportunities. In Mount Laurel II, the Court stated:
The Constitution of the State of New Jersey does not require bad planning. It does not require suburban spread. It does not require rural municipalities to *165 encourage large scale housing developments. It does not require wasteful extension of roads and needless construction of sewer and water facilities for the out-migration of people from the cities and the suburbs. There is nothing in our Constitution that says that we cannot satisfy our constitutional obligation to provide lower income housing and, at the same time, plan the future of the State intelligently. [92 N.J. at 238, 456 A.2d 390].
RCAs in general, and the agreement between Warren and New Brunswick in particular, reflect these concerns.
In short, the Public Advocate's attack upon the RCA between Warren and New Brunswick is in actuality an attack upon the basic concept of RCAs, which are authorized by the FHA and were upheld by the Supreme Court in Hills. Therefore, we conclude that the RCA conforms with the Mount Laurel doctrine and the FHA.

B
We turn next to the Public Advocate's claim that Warren's RCA with New Brunswick is racially discriminatory.[6] *166 Preliminarily, we note that the Public Advocate does not argue that the Legislature had a racially discriminatory motive for authorizing RCAs. Nor does he argue that Warren or New Brunswick had a racially discriminatory motive for entering into an RCA. Rather, his argument is solely that an RCA between a municipality with a small minority population such as Warren and one with a large minority population such as New Brunswick has a disparate racial impact and is therefore discriminatory. Consequently, under the Public Advocate's analysis, it would be permissible for Warren to enter into an RCA with a municipality which has the same predominantly white makeup as Warren.[7]
However, it is now firmly established that the absence of a discriminatory intent forecloses any finding of a violation of the Equal Protection Clause of the Fourteenth Amendment. Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., supra, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450; Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Urban League of Greater New Brunswick v. Township Comm. of Cranbury, 222 N.J. Super. 131, 143, 536 A.2d 287 (App.Div. 1987), rev'd on other grounds, 115 N.J. 536, 559 A.2d 1369 (1989). In Arlington Heights, the court rejected a claim that a municipality's refusal to rezone property for *167 lower income housing violated the Equal Protection Clause because that refusal had a disparate impact upon minorities:
[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact.... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. [429 U.S. at 264-65, 97 S.Ct. at 563, 50 L.Ed.2d at 464].
Since the Public Advocate does not claim that Warren's RCA with New Brunswick or COAH's approval of the RCA were racially motivated, he has not alleged facts which would establish a violation of the Equal Protection Clause.
Furthermore, the Public Advocate has not presented any reason for this court to reach a different conclusion under the equal protection guarantees of the New Jersey Constitution, N.J. Const. art. I, §§ 1, 5. To the contrary, our Supreme Court "has frequently recognized that the approach called for by a challenge to a state statute upon state equal protection grounds parallels that used under the federal Constitution." Levine v. New Jersey Dep't of Insts. & Agencies, 84 N.J. 234, 257, 418 A.2d 229 (1980); accord State v. Ramseur, 106 N.J. 123, 214-16, 524 A.2d 188 (1987); Greenberg v. Kimmelman, 99 N.J. 552, 580, 494 A.2d 294 (1985); Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249, 285-87 (1976) (reprinted in corrected form at 80 N.J. 6, 364 A.2d 1016), appeal dismissed and cert. den., 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977).
We also reject the Public Advocate's argument that the RCA between Warren and New Brunswick violates the Law Against Discrimination, N.J.S.A. 10:5-1 to -42. When the Legislature included authorization for RCAs in the FHA, it must be presumed to have been aware that such agreements ordinarily would be entered into between suburban municipalities with small minority populations and urban municipalities with substantial minority populations. Thus, the Public Advocate's argument is inconsistent with the fundamental principle that related statutes "are to be construed together as a unitary and harmonious whole, in order that each may be fully effective." *168 City of Clifton v. Passaic Cty. Bd. of Taxation, 28 N.J. 411, 421, 147 A.2d 1 (1958). Furthermore, the Public Advocate has failed to cite any specific section of the Law Against Discrimination which prohibits a municipality from funding public housing in another municipality simply because the municipality receiving the funds has a more substantial minority population.
Nor does Warren's RCA with New Brunswick violate the federal Fair Housing Act, 42 U.S.C.A. §§ 3601 to 3631. Although lower federal courts have held that a violation of the federal act can be established by a showing of discriminatory effect without a showing of discriminatory intent, they also recognize that governmental action may affect the racial composition of a community without violating this legislation. See, e.g., Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926 (2d Cir.), aff'd on other grounds, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988); Resident Advisory Bd. v. Rizzo, 564 F.2d 126 (3d Cir.1977), cert. den., 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283 (7th Cir.1977), cert. den., 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); see also Urban League of Greater New Brunswick v. Township Comm. of Cranbury, supra, 222 N.J. Super. at 143-150, 536 A.2d 287.
We are satisfied that the Public Advocate has failed to establish a prima facie case of racial discrimination under the federal Fair Housing Act based on Warren's RCA with New Brunswick. The section of the Act relied upon by the Public Advocate makes it unlawful "[t]o refuse to sell or rent ..., or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C.A. § 3604(a). This prohibition against discrimination in the sale or rental of real property has no applicability to a decision by a suburban municipality to fund the construction or *169 rehabilitation of housing in an urban municipality rather than to rezone for multifamily housing within its own boundaries. Nearly any government decision relating to land use or directing governmental funds to one municipality rather than another  whether for housing, education or other services  could have some impact on the racial composition of the affected municipalities. For example, a municipal decision to zone exclusively for single family residences on large lots rather than multifamily housing may result in less minorities residing in the municipality. So too, a decision to reallocate more state funding to education, housing or cultural facilities in urban areas may encourage some minority residents (as well as nonminority residents) to continue residing there rather than moving into adjoining predominantly white suburban areas. But such impacts of governmental policy decisions, however characterized, are not addressed by the federal Fair Housing Act. But cf. Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights, supra, 558 F.2d 1283.
Furthermore, even if a prima facie case of a discriminatory effect is established, governmental action will not be found to violate the federal Fair Housing Act if it furthers "a legitimate, bona fide governmental interest" and "no alternative would serve that interest with less discriminatory effect." Huntington Branch, NAACP v. Town of Huntington, supra, 844 F.2d at 936; accord Resident Advisory Bd. v. Rizzo, supra, 564 F.2d at 149. An RCA satisfies this test. The State certainly has a legitimate, indeed compelling, interest in rehabilitating or replacing substandard housing in urban areas. And the means other than RCAs available to accomplish this objective are inadequate, because federal and state funds for the construction and rehabilitation of lower income housing are extremely limited. Therefore, even if an RCA were considered to have a "discriminatory effect" despite the fact that it will result in new or rehabilitated housing for a substantial number of minority residents of an urban area, it still would not violate the federal Fair Housing Act, because it furthers a legitimate, *170 bona fide governmental interest and no alternative means are available which serve that interest with less discriminatory effect.

III
N.J.A.C. 5:92-15.1 provides:
For all low and moderate income housing units provided in inclusionary developments, municipalities shall establish occupancy such that initially, no more than 50 percent of the units are made available to income eligible households that reside in the municipality or work in the municipality and reside elsewhere.
The Public Advocate concedes that the occupancy preference included in Warren's fair share plan conforms with N.J.A.C 5:92-15.1. Nevertheless, he argues that the preference is violative of the Mount Laurel doctrine because it decreases the amount of Mount Laurel housing available to nonresidents and that it violates constitutional and statutory prohibitions against racial discrimination because it will decrease the number of minorities who occupy Mount Laurel housing in Warren.

A
Our consideration of whether a regulation authorizing occupancy preferences violates the Mount Laurel doctrine is governed by well established principles of judicial review of administrative agency action. "[A]n administrative agency's exercise of statutorily-delegated responsibility is accorded a strong presumption of validity and reasonableness." Van Dalen v. Washington Tp., supra, 120 N.J. at 244-45, 576 A.2d 819. Thus, there is a presumption that an agency's regulations are "legal and valid." Township of Bernards v. New Jersey Dep't of Community Affairs, 233 N.J. Super. 1, 9, 558 A.2d 1 (App. Div.), certif. den., 118 N.J. 194, 195, 570 A.2d 959 (1989). Moreover, an administrative agency may adopt not only regulations which directly implement the express provisions of its enabling legislation but also ones which are appropriate in the exercise of its general regulatory responsibilities. New Jersey Ass'n of Health Care Facilities v. Finley, 83 N.J. 67, 78-79, *171 415 A.2d 1147, cert. den., 449 U.S. 944, 101 S.Ct. 342, 66 L.Ed.2d 208 (1980).
The Legislature has conferred particularly broad authority upon COAH. In Van Dalen v. Washington Tp., supra, 120 N.J. at 246, 576 A.2d 819, the Court observed that judicial deference to COAH's exercise of its statutory responsibilities is "especially appropriate" because it "is charged with the implementation of ... a new and innovative legislative response to deal with the statewide need for affordable housing." To the same effect, in Holmdel Builders Ass'n v. Township of Holmdel, 121 N.J. 550, 576, 583 A.2d 277 (1990), the Court stated that "[i]t cannot be overstressed that the Legislature, through the FHA, intended to leave the specific methods of compliance with Mt. Laurel in the hands of COAH and the municipalities, charging COAH with the singular responsibility for implementing the statute and developing the state's regulatory policy for affordable housing." See also Hills Dev. Co. v. Township of Bernards, supra, 103 N.J. at 46, 510 A.2d 621 ("[W]e stand ready to defer, not only to the Legislature ..., but also to the Council ..., at least until `clear and convincing evidence' leads us to a different course.").
Although the FHA does not expressly authorize an occupancy preference for Mount Laurel housing for households which have existing roots in a municipality, we believe COAH has the implied power to adopt regulations which authorize this preference. We are also satisfied that the specific form of preference authorized by N.J.A.C. 5:92-15.1 is not arbitrary or capricious and that it was proper for Warren to include such a preference in its fair share plan.
Initially, we note that the impact of the occupancy preference upon the availability of Mount Laurel housing for households which do not reside in Warren is speculative. Because the preference extends to a maximum of 50% of the Mount Laurel units, at least 50% of the units will not be subject to any preference. Even more significantly, the preference extends *172 not only to residents of Warren but also to households with a member who works in Warren. The Public Advocate concedes that this part of the occupancy preference authorized by N.J.A.C. 5:92-15.1 is fully consistent with the requirements of Mount Laurel. See Mount Laurel I, 67 N.J. at 187, 336 A.2d 713; Mount Laurel II, 92 N.J. at 211, 456 A.2d 390. Moreover, the record indicates that there are a substantial number of persons employed in Warren, presumably including many in lower paying jobs. Consequently, it may be reasonably anticipated that a substantial percentage of the Mount Laurel units to which the preference applies will be occupied by persons who now reside outside Warren but work within the municipality.
Furthermore, COAH could reasonably have concluded that substantial public policies would be served by extending a limited occupancy preference to local residents. As the Public Advocate pointedly observes, the cost of housing in Warren, as in other affluent suburban municipalities, is extremely high. Consequently, local residents who experience a downturn in their financial circumstances may be forced to move out of Warren unless below market cost housing is available to them. For example, a retired couple living on social security, a small pension and limited savings, may be compelled by raised taxes and maintenance costs to sell their home but may desire to remain near their longtime friends and continue their involvement in community social activities. Likewise, a divorced custodial parent may lose possession of the former marital home and experience a dramatic decrease in income which would make it impossible to purchase or rent market rate housing in an affluent municipality such as Warren but want to avoid the trauma to the children which would be caused by changing schools or leaving friends. The availability of Mount Laurel housing to local families faced with such circumstances may prevent serious personal hardship. In addition, the continued residency of families with historical roots in a community may help preserve its social fabric. We believe COAH's broad powers under the FHA allow it to address these concerns *173 through the kind of limited occupancy preference authorized by N.J.A.C. 5:92-15.1.[8]
COAH also could reasonably have concluded that recognition of occupancy preferences would enable municipal officials to devise fair share plans which would be more likely to gain the acceptance of their constituents and thus promote voluntary compliance with the Act. One of the declarations set forth in the FHA is that "the State's preference for the resolution of existing and future disputes involving exclusionary zoning is the mediation and review process set forth in this act and not litigation." N.J.S.A. 52:27D-303. In the same spirit, the Supreme Court in Hills observed that the FHA has "the kind of legitimacy that may generate popular support, the legitimacy that comes from enactment by the people's elected representatives" and that "it may result in voluntary compliance, largely unachieved in a decade by the rule of law fashioned by the courts." 103 N.J. at 43, 510 A.2d 621. An occupancy preference for local residents and workers enhances the likelihood of public acceptance of a fair share plan, thereby promoting voluntary compliance.
We also emphasize that the occupancy preference authorized by N.J.A.C. 5:92-15.1 does not result in any decrease in satisfaction of the overall regional need for lower income housing, because the households to whom the preference is extended must satisfy the same eligibility standards as all other occupants of Mount Laurel housing. Moreover, the effect of any decrease in the availability of Mount Laurel housing for non-residents who do not work in Warren caused by the preference is mitigated by the use of RCAs to finance the rehabilitation of *174 substandard homes and the construction of new affordable housing in urban areas.
Consequently, we find no inconsistency between a limited occupancy preference for households with present roots in a municipality and the obligation, articulated in the Mount Laurel opinions and now codified in the FHA, that "every municipality in a growth area has a constitutional obligation to provide through its land use regulations a realistic opportunity for a fair share of its region's present and prospective needs for housing for low and moderate income families." N.J.S.A. 52:27D-302(a).
Finally, we reiterate the Supreme Court's admonition in Van Dalen v. Washington Tp., supra, that because the Fair Housing Act is a "novel" legislative scheme, "the implementation of its goals is necessarily an evolving process." 120 N.J. at 246, 576 A.2d 819. Accordingly, COAH has a continuing responsibility to monitor the actual operation of the occupancy preference to assure that it does not result in abuses, such as the occupancy of Mount Laurel units by households which are not truly lower income.[9] But COAH could reasonably have concluded based on currently available data that the occupancy preference authorized by N.J.A.C. 5:92-15.1 represents a reasonable accommodation of the legitimate desire of municipalities to grant a preference to those with existing roots in the community and the mandate of Mount Laurel that local land use ordinances reflect regional needs.

B
We turn next to the Public Advocate's argument that the occupancy preference authorized by N.J.A.C. 5:92-15.1 violates *175 constitutional and statutory prohibitions against racial discrimination. Preliminarily, we note that the Public Advocate does not allege either that COAH's adoption of N.J.A.C. 5:92-15.1 or Warren's incorporation of an occupancy preference in its fair share plan were racially motivated. Rather, the Public Advocate's racial discrimination claim is solely one of disparate impact; that is, that the occupancy preference will result in less minorities occupying the Mount Laurel housing constructed in Warren, because its present minority population is less than the average in the region. Moreover, even that racial impact is speculative. While Warren's minority population is relatively small, there are more jobs than housing units in the municipality, and there is no indication that the percentage of minorities who work in Warren is less than in the region as a whole. Furthermore, given the relative affluence of Warren's current residents, it may be reasonably anticipated that a substantial portion of the households which qualify for the occupancy preference will be comprised of local workers rather than local residents. Therefore, the occupancy preference may have limited, if any, impact upon the racial composition of Mount Laurel housing in Warren.
In any event, even if N.J.A.C. 5:92-15.1 had the disparate racial impact hypothesized by the Public Advocate, it would not violate any constitutional or statutory prohibition against racial discrimination. As discussed in section II.B. of this opinion, the absence of any allegation that the residency preference authorized by N.J.A.C. 5:92-15.1 has a discriminatory intent forecloses any claim under the United States or New Jersey Constitutions. Furthermore, our courts have recognized the constitutional legitimacy of municipalities extending preferences to local residents in a variety of other contexts. See, e.g., Abrahams v. Civil Serv. Comm'n, 65 N.J. 61, 319 A.2d 483 (1974); Van Ness v. Borough of Deal, 145 N.J. Super. 368, 367 A.2d 1191 (App.Div. 1976), rev'd on other grounds, 78 N.J. 174, 393 A.2d 571 (1978). For example, in Van Ness v. Borough of Deal, supra, this court noted that:

*176 State constitutions and statutes, including our own, frequently accord a preference, or condition access to some governmental right or privilege, on the basis of state, county or municipal residency.
* * * * * * * *
Both the Supreme Court of the United States and the courts of this State have held that a state or lesser political subdivision may, when reasonable, constitutionally differentiate between residents and nonresidents in providing access to some right, privilege or benefit. [145 N.J. Super. at 374-75, 367 A.2d 1191].
See also McCarthy v. Philadelphia Civil Serv. Comm'n, 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (1976) (upholding ordinance requiring municipal employees to be residents of municipality).
Furthermore, any incidental impact the occupancy preference may have upon the racial makeup of the occupants of Mount Laurel housing would not violate the federal Fair Housing Act, 42 U.S.C.A. §§ 3601 to 3631. The federal Act's prohibition against discrimination in the sale or rental of real property, discussed in section II.B. of this opinion, is limited to discrimination "because of race, color, religion, sex, familial status or national origin." 42 U.S.C.A. § 3604(a). Thus, the federal Act does not deal with a preference for government sponsored housing which is extended on the basis of present residence or place of employment. Therefore, unless an occupancy preference for government sponsored housing is adopted as a subterfuge for discrimination on the basis of race or another ground proscribed by 42 U.S.C.A. § 3604(a), which is not alleged in this case, it does not violate the federal Fair Housing Act.
And even if a prima facie case under the federal Act could be established based solely on a showing of disparate racial impact, we would nevertheless conclude that the occupancy preference authorized by N.J.A.C. 5:92-15.1 does not violate the Act. As discussed in section III.A. of this opinion, a municipality may have legitimate reasons to extend a limited preference for the occupancy of Mount Laurel housing to households with existing roots in the municipality. Therefore, *177 the occupancy preference furthers "a legitimate, bona fide governmental interest" and the Public Advocate has failed to suggest any alternative provision which "would serve that interest with less discriminatory effect." Huntington Branch, NAACP v. Town of Huntington, supra, 844 F.2d at 936; see Stingley v. City of Lincoln Park, 429 F. Supp. 1379, 1387-89 (E.D.Mich. 1977).
For similar reasons, we also reject the Public Advocate's argument that the occupancy preference violates the Law Against Discrimination, N.J.S.A. 10:5-1 to -42.

C
Our dissenting colleague views N.J.A.C. 5:92-15.1 as a durational residence provision which infringes upon the right to interstate travel recognized in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) and its progeny. Preliminarily, we note that the Public Advocate does not contend that N.J.A.C. 5:92-15.1 violates the constitutional right to interstate travel; his constitutional arguments are limited to claims of racial discrimination. And ordinarily courts do not consider issues which have not been presented by the parties, especially constitutional issues of broad public significance. See Robbiani v. Burke, 77 N.J. 383, 395, 390 A.2d 1149 (1978).
In any event, it is clear to us that N.J.A.C. 5:92-15.1 does not present any substantial issue with respect to the constitutional right to travel. The cases which have found violations of this right have all involved durational residency provisions under which a person was required to reside in a state or municipality for a specified period of time before becoming eligible for a particular benefit. See, e.g., Shapiro v. Thompson, supra, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (invalidating one year residency requirement for eligibility for welfare); Memorial Hosp. v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (invalidating one year residency requirement for eligibility for public medical assistance). *178 However, no violation of the constitutional right to interstate travel has been found where entitlement to a governmental benefit is conditioned solely upon current residency in a state or municipality. See, e.g., Martinez v. Bynum, 461 U.S. 321, 103 S.Ct. 1838, 75 L.Ed.2d 879 (1983) (upholding legislation which limits the right to a free public education to children of residents); McCarthy v. Philadelphia Civil Serv. Comm'n, supra, 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (upholding ordinance requiring city employees to be residents of the city); Abrahams v. Civil Serv. Comm'n, supra, 65 N.J. 61, 319 A.2d 483 (same); United Bldg. & Constr. Trades Council v. Mayor of Camden, 88 N.J. 317, 342-43, 443 A.2d 148 (1982) (upholding ordinance requiring 40% of workers on city public works projects to be city residents), rev'd on other grounds, 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984). In Abrahams v. Civil Serv. Comm'n, supra, 65 N.J. at 67, 319 A.2d 483, the Court pointedly noted that "there was no intent [in Shapiro v. Thompson] to affect the validity of residence requirements not of a durational nature." See also Martinez v. Bynum, supra, 461 U.S. at 325, 103 S.Ct. at 1841 (The Supreme Court "always has been careful to distinguish ... durational residence requirements from bona fide residence requirements").
Consistent with this distinction, the only form of residency requirement for government sponsored housing which has been held unconstitutional is a durational residency provision. See, e.g., King v. New Rochelle Mun. Hous. Auth., 442 F.2d 646 (2d Cir.) (invalidating five year residency requirement for public housing), cert. den., 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971); Cole v. Hous. Auth. of Newport, 435 F.2d 807 (1st Cir.1970) (invalidating two year residency requirement for public housing). In fact, the court in King expressly noted that:
In reaching our conclusion we emphasize that we are here deciding only the validity of a durational residency requirement for admission to public housing. As in Shapiro there is no contention here that a state or local government may not require that applicants for public services be bona fide residents. [442 F.2d at 649].
*179 N.J.A.C. 5:92-15.1 is not a durational residency requirement subject to the constitutional constraints set forth in Shapiro, Cole and the other cases relied upon in the dissent. The availability of the occupancy preference authorized by this regulation is not dependent upon the length of time a household has resided or had a member working in a municipality. Thus, households which have moved into or had a member begin working in Warren within the last month have the same opportunity to enjoy the benefit of the preference as a household comprised of long-term residents. Consequently, N.J.A.C. 5:92-15.1 authorizes a bona fide current residency requirement which serves the legitimate desire of municipalities to grant a preference for the occupancy of Mount Laurel housing to those with existing roots in the community and does not affect the constitutional right to interstate travel.

IV
The Public Advocate contends that COAH's regulations which authorize municipal fair share plans that fail to provide housing units affordable to households earning less than 40% of the region's median income do not create a realistic opportunity for the creation of housing affordable to all categories of people and therefore do not satisfy the Mount Laurel obligation. See Mount Laurel I, 67 N.J. at 179, 336 A.2d 713; Mount Laurel II, 92 N.J. at 209-11, 456 A.2d 390.
In Mount Laurel II, the Court required land use regulations to create a realistic opportunity for a municipality's fair share of the region's need for low and moderate income housing. 92 N.J. at 208-9, 456 A.2d 390. The Court defined low income families as those whose incomes do not exceed 50% of the region's median income and moderate income families as those whose incomes do not exceed 80% of the region's median income. Id., at 221 n. 8, 456 A.2d 390. The FHA similarly defines low income households as those earning 50% or less of the region's median income and moderate income households as *180 those earning between 50 and 80% of the region's median income. N.J.S.A. 52:27D-304(c) and (d).
COAH's regulations establishing affordability standards for the occupancy of Mount Laurel housing resulted from an extensive review of affordable housing problems by a task force consisting of members of COAH and outside housing experts. See 18 N.J.R. 2083. After the task force's recommendations were put in the form of proposed regulations, COAH received extensive public comments. See 18 N.J.R. 2442-44. In responding to an objection that its proposed affordability standards do not provide sufficient opportunities for low income units, COAH stated:
The proposed rule is intended to provide affordable housing to the widest possible spectrum of low and moderate income households. However, the rule recognizes the problems low income households have in qualifying for mortgages, raising a downpayment and paying for closing costs. Due to these difficulties, the Council did not think it was realistic to require purchased housing to be priced so as to be affordable to those households earning less than forty percent of median income. However, it should be noted that the Council has recognized the need of very low income households by requiring a rental housing component of municipalities and by allowing municipalities to accommodate their housing obligations through alternative living arrangements that are a more realistic economical alternative to very low income households. [18 N.J.R. 2443].
COAH's regulations define "low income housing" as "housing affordable according to [HUD] or other recognized standards for home ownership and rental costs, and occupied or reserved for occupancy by households with a gross household income equal to 50% or less of the median gross household income for households of the same size within the housing region in which the housing is located...." N.J.A.C. 5:92-1.3. The regulations define "moderate income housing" similarly, except that this term applies to households whose gross income are "more than 50% but less than 80%" of the median gross income. N.J.A.C. 5:92-1.3. COAH's regulations further provide that at least one half of the units within an inclusionary development must be available to low (as opposed to moderate) *181 income households. N.J.A.C. 5:92-5.14. N.J.A.C. 5:92-14.2 provides with respect to Mount Laurel housing constructed for sale as part of an inclusionary development that:
(a) Municipalities shall provide within their housing element that the average price of low and moderate income units within an inclusionary development be, as best as practicable, affordable to households at 57.5 percent of median income as contained in N.J.A.C. 5:92-12.4.
(b) In devising a range of affordability for purchased housing, as required in (a) above, municipalities shall provide, as best as practicable, for the following distribution of prices for every 20 low and moderate income units:

 Proposed Pricing Stratification
 Low 1 at 40 through 42.5 percent
 3 at 42.6 through 47.5 percent
 6 at 47.6 through 50 percent
 Moderate 1 at 50.1 through 57.5 percent
 1 at 57.6 through 64.5 percent
 1 at 64.6 through 68.5 percent
 1 at 68.6 through 72.5 percent
 2 at 72.6 through 77.5 percent
 4 at 77.6 through 80 percent

In addition, N.J.A.C. 5:92-12.12(a) provides that sale units are considered to be affordable if "after a downpayment of 10 percent, the monthly principal, interest, taxes, insurance and condominium fees do not exceed 28 percent of an eligible gross monthly income." And N.J.A.C. 5:92-12.12(b) provides that rental units are considered to be affordable if the rent does not exceed "30 percent of the gross monthly income of the appropriate household size."
The Public Advocate contends that these regulations are invalid because they make no provision for housing that is realistically affordable to households with income below 40% of the median household income in the region. However, the Public Advocate does not indicate how housing can be made *182 affordable to this category of lower income households through inclusionary developments or any of the other remedial devices suggested in Mount Laurel II, 92 N.J. at 258-78, 456 A.2d 390, or authorized by the FHA. In Mount Laurel II, the Court recognized that "construction of lower income housing is practically impossible without some kind of governmental subsidy." 92 N.J. at 263, 456 A.2d 390. See also Mount Laurel at Work, supra, 41 Rutgers L.Rev. at 1261 ("[I]t is clear that the private market cannot provide affordable housing to the full range of households in need."). In fact, the Court noted that, without government subsidies, a municipality's compliance with its Mount Laurel obligation may result in housing which is not affordable even to low and moderate income households:
There may be municipalities where special conditions such as extremely high land costs make it impossible for the fair share obligation to be met even after all excessive restrictions and exactions, i.e., those not essential for safety and health, have been removed and all affirmative measures have been attempted. In such cases, and only in such cases, the Mount Laurel obligation can be met by supplementing whatever lower income housing can be built with enough "least cost" housing to satisfy the fair share. [92 N.J. at 277, 456 A.2d 390; emphasis in original].
The Court also clearly indicated that the Mount Laurel doctrine only constitutes a limitation upon the municipal power to zone and is not an affirmative guarantee of subsidized government housing: "We do not suggest that a municipality would be required to create a housing authority to meet its Mount Laurel obligation." Mount Laurel II, 92 N.J. at 264, 456 A.2d 390. The FHA states this limitation upon the Mount Laurel doctrine in equally clear terms: "Nothing in this act shall require a municipality to raise or expend municipal revenues in order to provide low and moderate income housing." N.J.S.A. 52:27D-311(d).
Therefore, we are satisfied that COAH is authorized to establish affordability standards within ranges that will enable developers to construct economically viable inclusionary developments. Although those standards are subject to challenge on the ground of unreasonableness, the Public Advocate has not *183 pointed to any data which indicates that COAH's current affordability standards fail to properly implement the goals of Mount Laurel within the economic limitations imposed by the operation of the private real estate market.
Accordingly, we reject the Public Advocate's challenge to the validity of COAH's regulations governing RCAs, occupancy preferences and affordability standards and affirm the grant of substantive certification to Warren's fair share plan.
SHEBELL, J.A.D., concurring in part and dissenting in part.
I join in the opinion of the majority on all issues except that I am unable in this, and in several companion appeals, to join in those portions of the majority's decisions which will give validity to occupancy preferences of up to fifty percent of the low and moderate income housing units provided in inclusionary developments for income eligible households that reside in the municipality or work in the municipality and reside elsewhere.
All parties concede that there is no statutory authority for the granting of occupancy preferences, and the majority appears to agree that the entire statutory scheme is based on regional needs. The Public Advocate persuasively argues that local preferences detract from the Mount Laurel objective of providing adequate and affordable housing to lower income persons from the region who do not reside in the particular municipality which has the available land and resources.
Even if I were to put aside the arguments of the Public Advocate to the effect that the preference is invalid because it decreases the available Mount Laurel housing for nonresidents and perpetuates racial barriers, I nonetheless would be compelled to conclude that there are insurmountable federal and state constitutional prohibitions against permitting governmental action that compels the developer of inclusionary housing to establish occupancy preferences which exclude persons who do not reside or work in a municipality from fifty percent of the *184 units. The residency preferences in question constitute a mandatory precondition or pre-qualification to eligibility for occupancy of low and moderate income housing even when provided by a private developer upon non-public lands in inclusionary developments.
These preconditions of eligibility bear no resemblance to ordinances that require employees to establish and continue residence within a municipality as were sustained in Abrahams v. Civil Serv. Comm'n, 65 N.J. 61, 319 A.2d 483 (1974) and United Bldg. & Constr. Trades Council v. Camden, 88 N.J. 317, 443 A.2d 148 (1982), rev'd on other grounds, 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984). Our New Jersey Supreme Court in Abrahams took pains to distinguish the issue presented to it from the unconstitutional pre-qualifying durational residence requirements struck down in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The majority cites Abrahams and Van Ness v. Borough of Deal, 145 N.J. Super. 368, 367 A.2d 1191 (App.Div. 1976), rev'd on other grounds, 78 N.J. 174, 393 A.2d 571 (1978), as authority for the proposition that "our courts have recognized the constitutional legitimacy of municipalities extending preferences to local residents in a variety of other contexts." Those authorities are not persuasive here.
The issue in Van Ness was whether a municipal beach club can limit membership to residents only. 145 N.J. Super. at 371, 367 A.2d 1191. The court in Van Ness noted that the municipal swim club was developed and maintained by local taxation upon residents of that governmental unit, and that the facility provided a convenience to the residents under the statutory authority accorded to municipalities to provide for the health, welfare, and safety of their inhabitants. Id. at 376, 367 A.2d 1191.
The pre-qualifying preferences here impinge upon the basic rights of those disadvantaged by having limited means, whether from out of state, out of county, or out of municipality, to travel and seek affordable housing, established by governmental *185 action, on an equal footing with those in the same economic class who happen to reside or work in the municipality. See Salorio v. Glaser, 82 N.J. 482, 513-14, 414 A.2d 943, cert. denied, 449 U.S. 874, 101 S.Ct. 215, 66 L.Ed.2d 94 (1980). Unquestionably, the fourteenth amendment is applicable to municipal ordinances as well as state statutes. See Trombetta v. Atlantic City, 181 N.J. Super. 203, 229, 436 A.2d 1349 (Law Div. 1981), aff'd, 187 N.J. Super. 351, 454 A.2d 900 (App.Div. 1982). Even assuming that the preferences do not have the deliberate purpose of inhibiting migration by needy persons into the municipality, it would appear that the equal protection guarantees nonetheless prohibit governmental action which results, without sufficient justification, in a substantial deterrence to migration. See Shapiro v. Thompson, 394 U.S. at 629, 89 S.Ct. at 1328, 22 L.Ed.2d at 612; see also Memorial Hosp. v. Maricopa Cty., 415 U.S. 250, 258, 94 S.Ct. 1076, 1082, 39 L.Ed.2d 306, 315 (1974); Phan v. Commonwealth of Va., 806 F.2d 516, 519-20 (4th Cir.1986); Cole v. Hous. Auth. of Newport, 435 F.2d 807 (1st Cir.1970).
Admittedly, this restriction does not fit precisely within the definition of a durational residency requirement as established by Shapiro and its progeny. Nevertheless, it cannot simply be viewed as a continuous residency requirement. The root of the problem in the first place is the inability of the disadvantaged to establish residency. The preference itself further obstructs access to that residency. The net result is a mechanism to favor the preservation of municipal homogeneity while hindering the economically disadvantaged out-of-municipality resident's ability to migrate and settle. Neither the New Jersey authority cited by the majority, nor the justifications the majority advances to uphold the preference, can sanction such a result.
The court in Cole was presented with many of the arguments advanced by the majority here to justify the residency preference, such as providing a means for continued residency within the community of those with historical roots and otherwise *186 helping to "preserve [the municipality's] social fabric." The Cole court held that the durational residency requirement for public housing under review was unconstitutional even under the traditional "rational basis" standard as "the goal of promoting provincial prejudices towards long time residents is [not] cognizable under a constitution which was written partly for the purpose of eradicating such provincialism." 435 F.2d at 812.
I am convinced that, recognizing the treacherous constitutional quagmire into which the resident's and worker's preferences draw us, we should not strain to validate them especially when it disserves the purposes of our Mount Laurel holdings. I would therefore declare the residency preferences invalid.
NOTES
[1] The operation and validity of the regulation authorizing rental bonus credits, N.J.A.C. 5:92-14.4(d), was addressed by this court in Calton Homes, Inc. v. Council on Affordable Hous., 244 N.J. Super. 438, 456-58, 582 A.2d 1024 (App.Div. 1990), certif. den., ___ N.J. ___ (1991).
[2] This region, called the West Central region, consists of all the municipalities in Hunterdon, Middlesex, Somerset and Warren counties. N.J.A.C. 5:92-2.1.
[3] We also are issuing separate opinions today in six other appeals by the Public Advocate from COAH's grant of substantive certification to municipal fair share plans in which overlapping issues are raised, In re Petition For Substantive Certification filed by the Township of Tewksbury, A-5452-87T3, In re Petition for Substantive Certification filed by the Township of Bloomingdale, A-5450-87T3, In re Petition for Substantive Certification filed by the Borough of Hillsborough, A-6118-87T3, In re Petition for Substantive Certification filed by the Township of Denville, 247 N.J. Super. 186, 588 A.2d 1248 (App.Div. 1991), In re Petition for Substantive Certification filed by the Township of Holmdel, A-2298-88T3 and In re Petition for Substantive Certification filed by the Borough of Roseland, 247 N.J. Super. 203, 588 A.2d 1256 (App.Div. 1991).
[4] Indeed, as discussed in section II of this opinion, the Public Advocate's argument in effect constitutes an attack upon the validity of N.J.S.A. 52:27D-312, the section of the FHA authorizing RCAs.
[5] Although the Public Advocate did not object to COAH's affordability standards in connection with Warren's fair share plan, he represents that COAH had indicated in other proceedings that it would not entertain objections to the standards. The Attorney General does not argue that the Public Advocate is foreclosed from challenging the affordability standards due to a failure to exhaust administrative remedies.
[6] The Public Advocate asserts that COAH has disclaimed any responsibility to disapprove a fair share plan which violates constitutional and statutory prohibitions against racial discrimination. The Public Advocate points to two sentences in COAH's opinion in Holmdel, discussed in section I.C. of this opinion, which state that:

[The Mount Laurel doctrine] is not designed to address the question of racial disparities between municipalities.... To the extent that a party's concerns arise out of alleged racial disparities between municipalities, such actions are beyond the Council's mandate as set forth in the Fair Housing Act, and the Council concludes that it is thus an inappropriate forum in which to seek to redress such grievances.
We do not read this cryptic statement as a disclaimer by COAH of any responsibility to consider whether a fair share plan is racially discriminatory. Rather, we believe it simply reflects the agency's view that the effects of a fair share plan resulting solely from "racial disparities between municipalities" do not violate any constitutional or statutory provision prohibiting racial discrimination. This reading of COAH's opinion is supported by the fact that the brief it has filed with this court does not disavow responsibility for racial discrimination claims but rather responds on the merits to those claims. Furthermore, COAH seeks to foster integrated housing opportunities through its regulations which require municipalities to engage in "affirmative marketing" of lower income units. N.J.A.C. 5:92-15. While COAH does not describe what constitutes "affirmative marketing," this term of art is widely used in governmental housing programs to refer to plans designed to ensure that members of minority groups have the same access to housing opportunities as all other persons. See 24 C.F.R. § 200.600 (defining term for use in housing programs of the federal Department of Housing and Urban Development); see also Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 257, 97 S.Ct. 555, 559, 50 L.Ed.2d 450, 459 (1977).
[7] Thus, the Public Advocate does not contend in the companion appeals in In re Petition for Substantive Certification filed by the Township of Holmdel and In re Petition for Substantive Certification filed by the Borough of Hillsborough (see n. 3) that the RCAs between Holmdel and Keansburg and Hillsborough and Phillipsburg are racially discriminatory, presumably because the sending and receiving municipalities are both predominantly white.
[8] We note that similar occupancy preferences were commonplace in the Mount Laurel compliance plans approved by the courts prior to enactment of the FHA. See Lamar, Mallach & Payne, Mount Laurel at Work: Affordable Housing in New Jersey, 1983-1988, 41 Rutgers L.Rev. 1197, 1222-27 (1989) [hereinafter Mount Laurel at Work].
[9] Some information on the occupants of Mount Laurel housing may be found in Mount Laurel at Work, supra, 41 Rutgers L.Rev. at 1249-58. We assume that COAH will review this and other available demographic data in considering whether its regulations should be modified.